We're here on an appeal on a motion to dismiss the plan of Senator Lang's action for lack of jurisdiction. And we've appealed on the basis that we believe the district court was incorrect in its decision. Keep your voice up, would you please counsel? Yes. And we believe the district court erred with respect to the decision as to whether or not We believe that there's a course of conduct, as announced in Walden, and we believe that there's conduct that's . . . I'm having difficulty. You're mumbling into . . . put the mic up. And be like a radio announcer where you go right into it. All right. We're at the ninth inning. All right. Fine. That's good. So, back to the argument. So, looking at this from this perspective of whether or not the district court looked at the proper elements for specific jurisdiction, we believe that they erred in . . . They. They. Erred. He. The district court. Yes. Not they. Yeah. The district court erred with respect to the Walden decision in utilizing the test to determine whether or not there was specific jurisdiction found and the facts supporting the complaint as it was filed. Specifically, we believe . . . specifically, the district court didn't look at the course of conduct or the conduct as to whether it was meaningful to determine whether or not we have specific jurisdiction on the part of the defendant. Let's take DPI and DPAG. What's the best you got on that? I don't even see any independent contacts with California by these entities. And Judge, you're correct. You don't see any in the record at this point. That's correct. You do not. And as I understand it, you did not allege they were alter egos of DSC. We only argued that during the briefs. That's correct. So, you didn't allege that in the underlying court? That's correct. Okay. So, then we move to DSC. Right. Okay. So, tell me why in DSC you think there are sufficient contacts. DHL, Your Honor, has a number of business platforms worldwide, including the defendant who was named in this action, to support the behavior or business that occurred in California. Namely, they have equipment that they utilize in California that was, if you will, the precursor to the establishment of a tunneling of a virtual private network between the parties so that we could transact business through California back out into the Netherlands. The issue of utilizing in-state resources to create a through path or a through way, if you will, to induce commercial activity into and through California, we believe, satisfies the specific jurisdiction that the courts have looked at in the Ninth Circuit. And what, Walden? Well, as I understand it, you've got to have, first of all, an intentional tort, and everybody kind of agrees this would be an allegation of an intentional tort. But the next is that you've got to show that it's expressly aimed at the forum state. And it seems to me that's the argument here, is it expressly aimed or not. So how do I get to expressly aimed? Well, Judge, when the parties initiated the contact, there was a tunnel, if you will, a virtual tunnel of electrical connection, if you will. I'm not a technical aficionado, but I can tell you that it wasn't just a mere internet passive activity. It was, in fact, the, if you will, the creation of a private network into California such that the parties would be able to transact control codes and send those back out to a foreign state. So you're saying signals were sent to California, which signals couldn't be sent to the other printing outlets of the party? That's correct. And without the California connection through the VPN network, the system wouldn't work? Well, Judge, partially correct. There was two networks created. This was, in fact, a second essential network on top of a cloud computing network. So not to mislead the court, truly, there were two virtual networks, two networks created. But this one was required in order to satisfy the requirements of DHL. So we established that network in order to maintain the business relationship. And this was able to be accomplished because prior to the creation of the network, DHL had pre-existing equipment within the U.S. and we believe also in the Burlingame area to create the network. And with that tunneling, we believe that was the express aiming that resulted after they received the cease and desist, knowing that they had allowed a license to expire, continued to access our network for purposes of conducting business into and through California and back out into Europe. And you're saying, excuse me, you're saying that that wasn't just something that happened in the ozone, either through the cloud or through other computer programs where the defendant might not have even known about it. You're saying the defendant and the plaintiff together established this and the defendant knew that it was a major part of the network to go through Camarillo, California? Correct, Judge. With respect to the knowledge, the parties actually entered into a VPN agreement identifying that this was the course of business that they would undertake. With respect to allowing this to take place, and as I'm getting to Judge's earlier question with respect to the express aiming, taking it one step further, it was just looking at it from a, the signals that were being transmitted were specifically between the parties at that point in time to initiate the transaction. Well, then, if I understand what you're telling me, DSC sent print requests to your California server causing the software to engage and create output data that was then sent back to the DSC printers in the Netherlands? Partially correct, Judge. The request for the signal came to DHL's equipment in California, which then came to our equipment in Camarillo. It wasn't just strictly, defendant wasn't involved in the transaction in state. Defendant was in state with respect to the commercial transacting. In order to get to us, they went through their own equipment in California, U.S., prior to coming to us. And then, DSC California then sent the print request to your printers in California, which sent all the stuff back to the Netherlands for printing. Correct. That's what you're saying? So this isn't what was left in Walden. We leave questions about virtual contacts for another day. These were more than virtual contacts. Correct. These are actual contacts with real equipment, real wires. So if the express aiming is met, have you met all of the other burdens that you've got to meet in order to meet your . . . like what about one which arises out of or relates to the defendant's forum related activities? Right. So we believe that the defendant was already in situ in California, having a server in place in California prior to engaging in business with DEC systems. So the forum was already identified, if you will, with commercial activity prior to our relationship. If it doesn't arise like this, are DSC's other contacts regarding the nondisclosure agreement or service agreements with third parties of any relevance here? Only with respect to the third prong of the test, which I believe is . . . Their. That's their burden. So I think they have a hard time climbing out of an issue of saying . . . It seems to me that unless we meet test one, which if it's as you suggested, absolutely leads to meeting test two, then I don't think their other contacts regarding the nondisclosure agreement and the service agreements with third parties would have any effect whatsoever. We've either got to meet it the way you outline it or not at all. Would you agree? I would agree. Well . . . I have no other questions. Do you want to stay the rest of your time for rebuttal?  Okay. Thank you. Good morning, Your Honor. Counsel, may it please the Court. Your Honor, I think you identified . . . Do you think it's me for the record, sir? I'm sorry, Tony White representing the appellees. I believe that Your Honor correctly identified the beginning failure with respect to the appellant's case, and that is that there is no conduct that was expressly aimed at the forum by DSC Netherlands, only conduct that was expressly aimed at DECCS. As a Supreme Court decision in Walden tells us, there is no personal jurisdiction in this forum over a forum defendant who has no contacts here other than its contacts with the plaintiff who happens to be a resident of this particular forum. The facts here establish that the appellee, DSC Netherlands, had only minor contacts with this forum solely because appellant DECCS chose to locate itself here, and they were only necessary to allow DECCS to send data out of the forum to DSC Netherlands in the Netherlands for services to be rendered by DSC Netherlands in the Netherlands. So again, the only contacts that we have with this forum are specifically because DECCS chose to locate itself here, which under Walden is insufficient to establish the minimum contacts necessary to satisfy due process. So you're suggesting that just because this was sent, I mean, what he suggests is that DSC sends its request to its California company, who then sends the request to a California server, which then prints the software, or then engages its software and creates output for the data in the Netherlands, and you're saying that is not expressly aiming at California? It is not, Your Honor. It's expressly— Well, just a minute. You first of all sent this to a California corporation, or a California entity, I won't say corporation, which then relates it again to another California entity to print it out. That seems pretty aiming at California. You didn't go to New York to send it to California. You went right to California entity. Your Honor, I would say that we aimed it at DECCS, who happened to locate it in California. If DECCS was— What about the entity that you first made the request to? Where was it? Well, first of all, Your Honor, there's an electronic request that's made by DSC Netherlands to DECCS to transmit print data. I think it's important to step back for a second and let's talk about the VPN network before the secondary VPN network was set up, because that informs us as to whether or not the conduct here was aimed at DECCS or aimed at the forum. The first VPN set up, the primary VPN, was set up with DECCS. Electronic requests would be sent by DSC Netherlands to DECCS. DECCS would then send print data to the front end of a VPN that was set in Europe. Data was then transmitted through the European end of DECCS's primary VPN in Europe through to DSC Netherlands' side of the primary VPN, which was in Prague, the Czech Republic. Then DSC Netherlands would receive this information in Europe and transmit it to the Netherlands for its use for its client in the Netherlands. That was the original setup for this relationship.  That is merely saying, okay, DECCS, wherever you might be located, whether it's Venezuela, Canada, United States, Mexico, we're going to send this communication to you. You send us this information for use in Europe. That system broke down because DECCS was having trouble communicating that information to DSC Netherlands in the Netherlands. That entirely European set of contacts broke down on DECCS's side. And so DECCS said, hey, let's change this. And so DECCS said, let's do it with a United States connection here. We're going to set up a system in DECCS sending now, instead of putting that information, DECCS's information in the front end of its VPN in the primary VPN in Europe, DECCS set it up in California. To get that information to the Netherlands for use in the Netherlands on the secondary VPN, DSC Netherlands had to have a relay point in the United States. That relay point took the information that DECCS put in its front end of the secondary VPN, took that information, relayed it to the Netherlands for use, then transmitted to DSC's facilities in the Netherlands for prints to take place for its service of clients in the Netherlands. So what we see is that until DECCS chose to locate itself here and needed to solve a problem here, this relationship had nothing to do with this forum. Only because DECCS experienced problems here is why we have any forum-related contacts. And I would say, I would say that, Your Honor, that it. The contact, you were analogizing this case to Walden versus Fiore. In Walden versus Fiore, Fiore stopped Walden in Georgia and took his money away, right? He never went to Nevada to take his money away. He did it in Georgia. Then Walden, who's a Nevada citizen, sues Fiore in Nevada. Fiore had never had any contact with Nevada or anybody in Nevada. That's not quite the case here. Here, DSC has contact with DECCS in California. If DSC doesn't have the contact with DECCS in California, the system doesn't work. It's an integral part of making the system work. Isn't that a difference? Your Honor, I agree with you on the factual difference between Walden and this case. However . . . And it goes to the question that Judge Smith said, which was intentionally aiming towards California. Fiore never aimed at Nevada. He aimed at Mr. Walden's money, which was in Georgia. And I agree with you on those facts, Your Honor. However, I think the important part of Walden is not the specific facts and whether they apply cleanly here. The important part of Walden is the holding that the Supreme Court announced as a result of those facts, and whether that holding applies to the facts that we have here. Well, but the language has to be taken in context with the facts. When the Supreme Court says contact with a plaintiff, or contact with a defendant, pardon me, is not enough, yeah, but it's contact of an intentional toward taking the money in Georgia. And you're saying that it's Dex's fault that they had to use California, because they couldn't deliver what they had agreed to in Europe. And I get that, but it wasn't done without knowledge of your client, right? I mean, your client might have been upset with it that we have to now send the material to the California and over and then back. But they knew that the California connection was part of the system now, even if that's not what they originally signed up for. Certainly, Your Honor, that DSC Netherlands understood that Dex was a California entity. Certainly, Your Honor, that DSC Netherlands understood that Dex was solving this particular Europe problem by creating this secondary VPN with a front-end connection in the United States. But again, when we apply the principle, the holding, the basic core rationale of Walden, we ask ourselves, we can ask ourselves a simple question. If Dex had chosen to locate itself in Canada, what would be DSC Netherlands' contacts with this for? The answer is none. There would be none. That is exactly the holding of Walden. But the problem comes, and I guess I'm going to test you just a little. The problem comes, they are in California. You did initiate contact with them in California. You did go to them in California. It isn't as if you say, well, if they'd have been in Texas, we'd have had to go to Texas. And therefore, Walden doesn't go there. But it doesn't necessarily, what we're looking at here is that the harm must arise out of the context that your client creates with the forum state. It must arise from harm that they likely know will be suffered in the forum state. Well, problem is that there is no place where the harm would have suffered except in California. If you are going to have intentionally done what they suggest you did. That's the only place it could be because that's where they are. Your Honor, if the jurisdictional question could be answered by where the harm would have been suffered, then Walden versus Fiori would have not been decided the way it was decided. Walden had three points. The first was, it must arise out of context that the defendant himself creates with the forum state, which I'm understanding you to say we didn't do, we were just talking to them, not the forum state. But then, in understanding how I repry that premise, I have to say that it causes harm defendant knows is likely to be suffered in the forum state. Well, frankly, I don't know where the harm couldn't have been done except in the forum state. Must arise from contacts with the forum state itself and not with persons who reside there. I'm striking out all of the other contacts you would have made. I asked him the very question. I said, if this deals with only non-disclosure agreements and service agreements with third parties, are we out? He said, yes, so I'll strike that. The third is, well, those are the two points. And so, therefore, I'm thinking Walden here applies. Even though you're saying we wouldn't have gone there if Dex weren't there, every contract is we wouldn't have gone there if that company didn't live there. But you were aiming at California. Your Honor, I agree with your last statement that every contract can be characterized as we wouldn't have gone there if the plaintiff didn't occupy that space in that forum. Which is the exact point of Walden. Because if we fall into that logical trap, then we will always find jurisdiction in the forum in which the plaintiff resides. If there's a situation where- It wouldn't if that's only where they resided, but they did business every other place. But in this particular matter, they didn't do business in any other place. And you specifically accessed their computer system in California to do what you had to do. We aimed our conduct at Dex wherever they were located. Your Honor, I think the principle of Walden is that if you cannot establish forum connections other than the fact that the plaintiff happens to reside there and to do business with the plaintiff, the defendant must engage in that forum to do that business, then you are unconstitutionally applying jurisdiction against a foreign defendant. I think you stated it well. In Walden versus Fiore, Mr. Walden was injured where? In Georgia. That's where they took the money away from him. He didn't use, he wasn't injured. He said, well, I would have spent the money in Nevada because I'm a Nevada citizen. But the money was taken away from him in Georgia. Your Honor, I would disagree because Mr. Walden had no intention of spending his money in Atlanta. He was, his intention was to spend his money in Nevada. His intention was to take that $90,000 that he had taken from Santa Domingo and bring it, and have it in his possession in Georgia. He was in Atlanta to catch a connecting flight. He wasn't going to spend $90,000 in the Atlanta airport. He was going to take it back to Nevada where he was going to spend it at his house. His injury occurred. Your client was using some facilities, some installations which were in California. Not just contracting with a California defendant to give him facilities anywhere else. He knew that the facilities were in Camarillo. Your Honor, there were no facilities by DSC Netherlands in California. The most that DSC Netherlands ever had was a- But I'm not talking about that, I'm talking about Dex facilities. Dex had facilities in California because Dex chose to be there. Well, of course. And you were using those facilities. You couldn't get the product you wanted unless you used those facilities, correct? Did you argue this in the state court? I mean, in the lower court? We did. Yeah, and that was before Axiom came out. Correct. Right, so you're dealing with Ninth Circuit law being Washington Shoe, which was basically reversed by- Yes. Walden, right? That's exactly right. And I think that the holding of Washington Shoe tells us a lot about whether we can apply jurisdiction consistent with the due process clause by simply saying, well, was the effect of your conduct felt in California by the plaintiff? Because that was the holding of the Ninth Circuit in Washington Shoe. A ridiculous holding. And it was rejected. Who was the trial judge who got reversed by the Ninth Circuit? It was me. He's emphasizing how bad we were on him. Let me go to the third point. Yes, Your Honor. The third point, you bear the burden. The exercise of jurisdiction must comport with fair play and substantial justice. Is there any evidence in this record about that? In fact, I don't even find any argument from you that it would be unreasonable or that it would not comport with fair play and substantial justice in these briefs. Your Honor, that's because we presume that we would never get to that spot because of what we believe to be foursquare holding of Walden. However- So if I don't agree with you on the first point, you just lose.  What I would say is- I didn't have any evidence in there. I will say this. Certainly, from the facts that have been established in this case, to suggest that a company that has no employees, no facilities, no equipment, no assets, no bank accounts, no nothing in this forum can be hailed into this jurisdiction for conduct that took place- I really would be a great argument if you'd ever made it before now. But I'm looking at the record, and that's all I can look at. And he's going to stand up and say, he can't argue that here. He never made it before. So I think all my question only goes to the sole question as, if I don't agree with you as to points one and two, then you lose. I disagree with that, Your Honor. I'm certainly- Well, you're not going to make an argument here that's going to make you win. Well, I'm certainly making the argument now, based on the facts that are presented to this court, that the jurisdictional analysis that would be- Well, then you don't understand appellate jurisdiction very well, because you're not going to make an argument here that you've waived in your briefs. Well, I would respectfully disagree with you that we've waived that argument, Your Honor. All right. I understand your point. I appreciate your argument, then. I would say, in the end, I would say, Your Honors, that the fact of DSC Netherlands conducting its activities in the Netherlands, conducting its activities in Europe solely with the concept of servicing its client in the Netherlands, requiring some form connections only because DEX had problems and needed us to allow it to service us from the United States, because it chose to be here, would not be an exercise of jurisdiction consistent with the Constitution. And I thank you for your time. Thank you very much, Mr. White. I think you have four and a half minutes of rebuttal time, if you wish to use it. Judge, I don't wish to use it. I'm going to submit. All right. Thank you very much. Case of DEX Systems versus Deutsche Post, A.G. et al. is submitted. And the court thanks counsel for their argument.
judges: Bea, N.R. Smith, Lasnik